NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| PROFOOT, INC., | |
| Plaintiff, | |
| | Civ. No. 11-7079 |
| v. | |
| | OPINION |
| MSD CONSUMER CARE, INC., | |
| Defendant. | |

THOMPSON, U.S.D.J.

This matter has come before the Court on Plaintiff ProFoot, Inc.'s ("ProFoot") Motion

for a Preliminary Injunction [42].  Defendant MSD Consumer Care, Inc. ("MSD") opposes this

motion [50].  An evidentiary hearing was held in this matter on May 17, 2012, at which time the

parties gave oral argument, presented witness testimony, and submitted documentary evidence.

After considering all of the submissions of the parties the Court has reached a determination

pursuant to Federal Rule of Civil Procedure 78(a).  For the following reasons, ProFoot's motion

will be denied.

## I.     BACKGROUND

This dispute arises out of the marketing strategies adopted by two competing companies

in the foot-care products market.  ProFoot is the maker of numerous foot-care products that use

registered trademarks consisting of different iterations of the word "ProFoot."  *See, e.g.*,

(Feldman Aff., Ex. E).  ProFoot, however, does not sell products under a "Pro" brand, separately

advertise their products using only the word "Pro," or own any "Pro" trademark registrations.

(Tr. 63:15–18, 64:11–17, 99:13–24).[1]  MSD, the maker of Dr. Scholl's foot care products, has

sold a line of orthotic shoe insoles under the brand name "Dr. Scholl's Pain Relief Orthotics"

since 2006.  (Howard Decl. ¶ 13).  During the summer of 2011, ProFoot became aware that MSD

was considering marketing its line of Pain Relief Orthotics under the acronym "P.R.O."  (Tr.

47:18–48:7).  Soon after, in either late August or early September of 2011, ProFoot noticed

MSD's Pain Relief Orthotic line of foot care products in the market using the designation

"P.R.O."  (*Id.* 49:18–24).  This suit followed.  Plaintiff now seeks to preliminarily enjoin MSD

from using the P.R.O. acronym on the Dr. Scholl's Pain Relief Orthotic product packaging and

from advertising their Pain Relief Orthotic products by using the word "pro" or the P.R.O.

acronym.

## II.     LEGAL STANDARD

The Lanham Act, 15 U.S.C. § 1051, *et seq.*, empowers a federal district court to issue an

injunction in order to prevent a trademark violation in accordance with "the principles of equity

and upon such terms as the court may deem reasonable."  15 U.S.C. § 1116(a).  Prior to a trial on

the merits, a preliminary injunction is warranted where it is necessary to preserve the status quo

before resolution of the case.  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

Preliminary relief, however, is "an extraordinary remedy" that should be granted "only in limited

circumstances."  *AT&T Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir.

1994) (internal quotation omitted).  The party seeking a preliminary injunction has the burden of

showing: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the

injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the

nonmoving party; and (4) that the public interest favors such relief."  *Kos Pharm., Inc. v. Andrx*

---

[1] Plaintiff did at one point sell other products using the surname "Pro" but has not sold any such products since
2006.  (Tr. 99:10–24).  Trademarks that are not used for three years are presumptively considered to be abandoned.
*See* 15 U.S.C. § 1127.

*Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citing *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d 1999)).

### III.   LIKELIHOOD OF SUCCESS ON THE MERITS

"The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir. 1983) [hereinafter "*Lapp*"].  A successful claim under the Lanham Act for trademark infringement requires a plaintiff to show (1) that it owns the mark at issue, (2) that its mark is both valid and legally protectable, and (3) that the defendant's use of the mark to identify its products is likely to cause confusion concerning the origin of those products. *See, e.g.*, *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 437 (3d Cir. 2000).

The parties in this case do not dispute that ProFoot has ownership over a valid and legally protectable mark.  MSD notes, however, that ProFoot does not have ownership over any trademarks using only the word "pro" and argues that this case must be looked at through this lens—i.e., the Court must keep in mind that the trademark at issue consists of the word "ProFoot" and not simply "pro."  The main dispute amongst the parties under the first prong of a preliminary injunction analysis is whether MSD's use of the P.R.O. acronym for its Pain Relief Orthotic line of foot-care products is likely to cause confusion as to the origin of those products or as to any of ProFoot's products.  "Likelihood of confusion exists when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir. 1978) (citing *James Burrough, Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 275 (3d Cir. 1976)).

In cases such as this, where two products are directly competing in the market, a court "need rarely look beyond the mark itself" in determining whether there is a likelihood of confusion. *Lapp*, 721 F.2d at 462. Nevertheless, a number of factors have been identified by the courts in determining whether two marks are likely to be confused with one another. These factors, commonly referred to as the *Lapp* factors, include the following:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark;
> (2) the strength of the owner's mark;
> (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
> (4) the length of time the defendant has used the mark without evidence of actual confusion arising;
> (5) the intent of the defendant in adopting the mark;
> (6) the evidence of actual confusion;
> (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;
> (8) the extent to which the targets of the parties' sales efforts are the same;
> (9) the relationship of the goods in the minds of consumers because of the similarity of function;
> (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*Id.* at 463 (citing *Scott Paper Co.*, 589 F.2d at 1229); *see also A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 212–13 (3d Cir. 2000) (applying these factors to directly competing goods). Despite this list of factors, "[a] district court should not be foreclosed from using any factors that it deems helpful in analyzing whether a likelihood of confusion exists between given products." *A&H Sportswear, Inc.*, 237 F.3d at 212. These factors "are meant to be tools, not hurdles." *Id.* at 214. A court need not consider each factor in every case and can look to additional facts relevant to the specific circumstances of a case. *Id.* at 214–15. Similarly, "the different factors may properly be accorded different weights depending on the particular factual setting." *Id.* at 215.

In this case, Plaintiff alleges both direct and reverse confusion.  A direct confusion claim exists when the junior user (here, MSD) purportedly attempts to free-ride on the "reputation and good will of the senior user by adopting a similar or identical mark." *Id.* at 228.  By contrast, "[t]he harm flowing from reverse confusion is that the public comes to assume the senior user's products are really the junior user's or that the former has become somehow connected to the later." *Id.* (citations omitted).  Under either theory, the ultimate question is the same: "whether [or not] there is a likelihood of consumer confusion as to the source or sponsorship of a product." *Id.* at 229.  The *Lapp* factors are used in analyzing both direct and reverse confusion claims.  *Id.*

After reviewing the evidence submitted by the parties the Court has determined that Plaintiff has not met its burden in establishing that it is likely to prevail in demonstrating a likelihood of confusion.  Accordingly, Plaintiff's motion for a preliminary injunction will be denied.

### A. Direct Confusion

#### 1. Similarity

Generally speaking, the most important *Lapp* factor used in determining the likelihood of confusion is the similarity between the marks.  *Id.* at 216 (citing *Fisons Horticulture, Inc. v. Vigoro Indus.*, 30 F.3d 466, 476 (3d Cir. 1994)).  In most cases a side-by-side comparison is not appropriate.  *See, e.g.*, *Kos Pharm., Inc.*, 369 F.3d at 713.  Rather, "[t]he proper test is . . . whether the labels create the same overall impression when viewed separately." *Id.* (quoting *Fisons Horticulture, Inc.*, 30 F.3d at 477).  When products are sold next to each other at market, however, a side-by-side comparison may be appropriate.  *McNeil Nutritionals, LLC v. Heartland Sweetener, LLC*, 511 F.3d 350, 359 (3d Cir. 2007) (citing *A&H Sportswear, Inc.*, 237 F.3d at 216).  Under either analysis, the Court does not believe that the ProFoot and "P.R.O. Pain Relief Orthotic" marks are sufficiently similar to warrant issuing a preliminary injunction.

In looking at the P.R.O. designation on the packaging to MSD's Pain Relief Orthotic line of shoe insoles, the Court is not convinced that the overall impressions created by the ProFoot mark and the Pain Relief Orthotic mark are the same.  Although it would be legal error for the Court to engage in a "detailed analysis of the differences in the marks rather than focusing on the overall impression created by them," *Fisons Horticulture, Inc.*, 30 F.3d at 478, there are several facts that the Court considers important in reaching its overall impression.  First, and perhaps most importantly in the Court's mind, on all five Pain Relief Orthotic products the P.R.O. designation is located immediately next to the words "Pain Relief Orthotic," thereby indicating to a consumer that P.R.O. is an acronym.  *See* (Exs. JXT-102, JXT-103, JXT-104, JXT-105, JXT-106).  This is further underscored by the periods immediately following each letter in the P.R.O. designation.  *See* (*id.*).  Thus, it appears to the Court that, properly framed, the competing marks are not "ProFoot" versus "P.R.O.", but rather "ProFoot" versus "P.R.O. Pain Relief Orthotics" or possibly even "ProFoot" versus "Dr. Scholl's P.R.O. Pain Relief Orthotics."  *See PB Brands, LLC v. Patel Shah Indian Grocery PB Brands, LLC*, 331 F. App'x 975, 980 (3d Cir. 2009) ("The overarching question is whether the marks, '*viewed in their entirety,*' are confusingly similar." (emphasis in original) (quoting *Kos Pharm., Inc.*, 369 F.3d at 714)). Whether sub-parts of two competing marks are confusingly similar is irrelevant.  *See Kos Pharm., Inc.*, 369 F.3d at 714.  The Court, therefore, cannot look at the P.R.O. acronym in isolation.  Moreover, the color, shape, and overall design of the competing marks are considerably different, which leaves a different overall impression with the Court, as well as likely consumers.

In addition, if compared side-to-side as these products would be at market, the products themselves are different in color, shape, and material, all of which is ascertainable by the consumer as a result of the transparent packaging of each product.  *See CareFirst of Maryland,*

*Inc. v. First Care, P.C.*, 434 F.3d 263, 271 (4th Cir. 2006) ("[C]ourts must examine the allegedly infringing use in the context in which it is seen by the ordinary consumer.").  Similarly, the packaging (as opposed to only the mark itself) is also sufficiently different to leave distinct overall impressions in the minds of consumers.  All of this plays into how a consumer would view the use of the P.R.O. acronym in context during its use at market.

  Another important distinction is that ProFoot's trademark consists of its "house brand," while MSD's use of P.R.O. is only one sub-brand of its Dr. Scholl's "house brand."  "[A]ffixing a well-known housemark like that of [Dr. Scholl's] can help diminish the likelihood of confusion."  *A&H Sportswear, Inc.*, 237 F.3d at 218 (citations omitted).  This is because "[u]se of a strong, well-known mark as a part of a composite name reduces the likelihood that the remainder of the composite name will create a commercial impression distinct from that mark."  *Id.* (collecting cases).  During the evidentiary hearing, one of MSD's executives, James Mackey, testified that MSD uses the Dr. Scholl's brand name to market all MSD foot care products, which is referred to as MSD's "master brand strategy."  (Tr. 105:1–108:6).  The Court finds this testimony both credible and convincing.

  One additional argument is made by ProFoot concerning the visual impression left by the competing marks.  ProFoot contends that the packaging of the Pain Relief Orthotic for "Ball of Foot" product was specifically designed to accentuate the designation "P.R.O." and the word "foot."  ProFoot has not offered any evidence, however, that this was done for the purpose of confusing consumers; ProFoot relies on mere conjecture.  Moreover, the Court does not find this argument persuasive because all five Pain Relief Orthotic products have the "P.R.O." designation followed by progressively larger words contained underneath.  *Compare* (Ex. JXT-106) *with* (Ex. JXT-102, JXT-103, JXT-104, JXT-105); *see also* (Tr. 153:17–156:11 (discussing placement of words on the packing)).

7

The closest similarity in the Court's view between the P.R.O. designation and ProFoot is auditory; both the P.R.O. acronym and the first syllable in ProFoot are pronounced the same. But, this alone does not give the Court the overall impression that the Pain Relief Orthotic brand and ProFoot are from the same source.  In *A&H Sportswear, Inc.*, for example, the court found that "Miraclesuit" and "The Miracle Bra" created different auditory impressions, despite the use of the same word in each name.  *See A&H Sportswear, Inc.*, 237 F.3d at 217.  Here, like in *A&H Sportswear, Inc.*, the two marks have a different number of syllables, the last syllable of each is different, and ProFoot bleeds two words together while P.R.O. Pain Relief Orthotics is a combination of several words.  *Id.*  These factors all weigh against the two marks sounding similar.  As noted above, P.R.O. is rarely, if ever, heard at market without reference to the Dr. Scholl's house brand.  This helps to further differentiate the overall impression created by the sound of the two marks at issue.

In sum, the Court is not left with the overall impression that the marks or products are related or would likely lead a consumer to the impression that the marks or products are related. Therefore this factor weighs in favor of MSD.

## 2. Actual Confusion

ProFoot has also not offered any convincing evidence that consumers have actually been confused by MSD's use of the P.R.O. acronym.  ProFoot has proffered two exhibits that it claims show customer confusion.  This evidence, however, fails to link any confusion to MSD's use of the P.R.O. acronym.

The first piece of evidence proffered by ProFoot is a hand-written letter signed by a person named Frosty Deyarmin.  (Ex. PXT-21).  In this letter, the customer notes that he or she had recently bought a pair of Dr. Scholl's shoes and that he or she was left unsatisfied by this purchase.  (*Id.*).  The customer also bought a pair of Dr. Scholl's shoe insoles, which were

subject to a money-back guarantee.  (*Id.*).  In this letter the customer asks whether this same money-back guarantee applied to the pair of shoes that the customer purchased or whether it applies only to the shoe insoles.  (*Id.*).  For some unexplained reason, instead of being sent to MSD, this letter was sent to ProFoot—addressed as "Proof, Inc." on the envelope in which the letter was sent.  Plaintiff argues that this is evidence that Defendant's use of the P.R.O. acronym is causing confusion in the market.  This letter is undated, (Tr. 69:18–20), and ProFoot's witness was only able to say that the letter was sent at some point in the last six months, (*id.* 69:22).  Moreover, there is nothing to indicate that the customer had ever seen the Pain Relief Orthotic brand of Dr. Scholl's shoe insoles or its use of the P.R.O. acronym.  (Tr. 69:23–70:21).  Simply put, this letter may show some sort of customer confusion, but the source of this confusion is merely speculative and the Court does not believe that it is probative of customer confusion over the use of the P.R.O. designation by MSD.

The second piece of evidence that Plaintiff claims shows actual confusion in the marketplace is an email sent on February 21, 2012 from a customer to a ProFoot employee.  (Ex. PXT-22).  In this email, the customer complains that version 2.2 of the 2 oz. Miracle, a ProFoot product, is not as good as the original version.  (*Id.*).  After making this complaint, the customer states: "Dr. Scholl's has taken over stores and their products don't compare to the original miracle.  Is the reason you stopped the product because you sold it to Dr Scholl [sic] and they threw it away to never be seen again[?]"  (*Id.*).  This email does not mention whether the customer has ever seen MSD and Dr. Scholl's use of the P.R.O. acronym.  (Tr. 67:17–68:11).  The customer's question also underscores the fact that they were aware that a difference existed between ProFoot and Dr. Scholl's products.  Although the customer questions whether Dr. Scholl's has bought ProFoot, this inquiry seems to be based upon the customer's perception of Dr. Scholl's market dominance.  (Ex. PXT-22 (Dr. Scholl's has taken over stores . . . .")).  At the

9

very least, nothing suggests that this inquiry was a result of the customer seeing Dr. Scholl's use of the P.R.O. acronym other than the timing of the email.

The Court is not convinced that either of these exhibits shows evidence of actual confusion occurring in the market. Moreover, MSD has been using the P.R.O. designation for at least eight months, if not longer. *See* (Tr. 49:18–24). If actual confusion is in fact occurring, stronger evidence of this confusion likely would have emerged by this time. "Evidence of only a small number of instances of actual confusion can be dismissed as inconsequential or *de minimis*. For example: Just as one tree does not constitute a forest, an isolated instance of confusion does not prove probable confusion. To the contrary, the law has long demanded a showing that the allegedly infringing conduct carries with it a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care." *McNeil Nutritionals, LLC*, 511 F.3d at 366 (internal citations and quotations omitted). Plaintiff has offered only two correspondences allegedly showing actual confusion, and to the extent that these correspondences do show confusion, there is nothing linking this confusion to MSD's use of the P.R.O. acronym. *Lapp* factors four and six thus weigh in favor of MSD.

### 3.  Intent

When evidence is presented that a defendant intentionally and willfully adopted a mark in order to promote confusion, this factor weighs strongly in favor of finding a likelihood of confusion. *See Kos Pharm., Inc.*, 369 F.3d at 721 (quoting *Checkpoint Sys. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 286 (3d Cir. 2001)). Plaintiff, however, has not presented any such evidence. Instead, Plaintiff relies on mere conjecture to support this factor.

Plaintiff first argues that MSD's desire to capture the entire foot-care market is probative of intent to cause confusion. To the extent that Plaintiff has submitted evidence that shows MSD sought to, as Plaintiff puts it, "eliminate PROFOOT from the marketplace for foot care devices,"

10

(Pl.'s Br. at 25), the Court gives this evidence little weight.  As in any robust industry, directly competing companies often seek to outperform their rivals and, if possible, eliminate them from the market.  The real question is whether one company seeks to accomplish this goal through inappropriate means such as improperly trading on another company's mark.

The first piece of evidence ProFoot proffers in order to establish intent to confuse consumers is an internal MSD document with a hand-written note in the margin.  (Spiro Cert., Ex. T).  This document shows a picture of a newly-designed draft version of the Pain Relief Orthotic packaging containing the use of the P.R.O. acronym from February of 2011.  (*Id.*).  This draft version of the packaging used the word "PRO," without periods placed at the end of each letter.  (*Id.*).  An arrow points from the "PRO Pain Relief Orthotic" portion of the packaging to the following notes written in the margin: "Jean worried about Professional, →vertical treatment, →highlight first letter, →periods." (*Id.*).  According to MSD, "Jean" is Jean Mazet, MSD's Consulting Manager for Foot Care, Regulatory Affairs.  Ms. Mazet's job consists of reviewing proposed product packaging and advertising in order to ensure compliance with applicable FDA guidelines and other regulations.  (Mazet Cert. ¶ 1).  According to Ms. Mazet's sworn certification, the suggestions listed were meant to insure that consumers would not get the impression that MSD was promoting its Pain Relief Orthotic brand as a replacement for those products/services offered by foot-care professionals, such as podiatrists or medical doctors.  (*Id.* ¶ 3).  MSD apparently took Ms. Mazet's recommendation to place periods after each letter because this change was made from the draft version of the packaging to the final version.  Ms. Mazet claims that this note was not in reference to ProFoot, (*Id.* ¶ 4), and ProFoot has offered only conjecture to refute this assertion.

In any event, "a defendant's mere intent to copy, without more, is not sufficiently probative of the defendant's success in causing confusion to weigh such a finding in the

plaintiff's favor; rather, defendant's intent will indicate a likelihood of confusion only if an intent to confuse consumers is demonstrated via purposeful manipulation." *A&H Sportswear, Inc.*, 237 F.3d at 225–26 (citing *Versa Prods. Co. v. Bifold Co. (Mfg.)*, 50 F.3d 189, 205–06 (3d Cir. 1995)).  In other words, the intent relevant for this *Lapp* factor is the intent to confuse the consumer, not the intent to copy the mark at issue.  This note says nothing about the intent to confuse.  If anything, under Plaintiff's interpretation, it indicates a desire to not confuse consumers by proposing suggestions to differentiate the mark.  Regardless, "copying, absent an intent to confuse, might do no more than signal to potential consumers that the junior user's product is in direct competition with the senior user's product.  Such copying might thus serve a [positive] communicative function." *Id.* at 226 n.16 (citing *Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556, 1565 (Fed. Cir. 1994)).

The next piece of evidence offered by ProFoot of MSD's alleged intent to confuse consumers is an email from an MSD employee that refers to ProFoot as "Pro." *See* (Spiro Cert., Ex. O).  This email was sent in May of 2008.  The Court does not believe that a single passing reference to ProFoot as "Pro" in all of MSD's internal communications is indicative of intent to cause confusion.  In a similar vein, ProFoot's only fact witness, Daniel Feldman, Executive Vice President, testified that others in the marketplace refer to ProFoot as "Pro."  (Tr. 97:23–98:9, 99:10–24).  Plaintiff therefore argues that MSD must have known that its use of the P.R.O. acronym was going to cause confusion.  This testimony, however, is self-serving and Plaintiff offered no other evidence to support this contention.  Further, as noted above, ProFoot does not argue that it has a trademark in the name "Pro."  Therefore, the Court does not consider this argument compelling.

ProFoot has offered no other evidence indicative of intent to confuse on behalf of MSD. Mr. Feldman testified at the evidentiary hearing that it was his belief that Dr. Scholl's launched

the Pain Relief Orthotic line of products in 2006 with the intent to, at some later time, shorten

this to P.R.O. for the purpose of trading off of ProFoot's brand name. (Tr. 91:3–92:5). This

belief, however, has no evidence to support it. (Tr. 92:1–5 (admitting he has no evidentiary

support)).

"[T]he defendant's intent may be discovered through such inquiries as whether the

defendant was aware of the senior user's mark when it adopted its own mark, and whether the

defendant considered that its adoption of the mark might result in confusion." *A&H Sportswear,*

*Inc.*, 237 F.3d at 232 (citations omitted). At the same time, however, "mere carelessness, as

opposed to deliberate intent to confuse[,] . . . does not shed light on this inquiry." *Id.* at 232–33.

Therefore, because ProFoot's arguments are based almost entirely on conjecture, the Court does

not believe that ProFoot has demonstrated that MSD had the intent to cause confusion by using

the P.R.O. acronym. This *Lapp* factor therefore weighs in favor of MSD.

### 4.  Strength of ProFoot's Mark

In looking at a direct confusion claim the stronger a plaintiff's mark is, the more

protection that mark should receive. *See Kos Pharm., Inc.*, 369 F.3d 715. Because a strong mark

has greater recognition, a similar mark is more likely to cause confusion. *Id.* (quoting *A&H*

*Sportswear, Inc.*, 237 F.3d at 222). The strength of a mark is measured by two prongs: (1) the

distinctiveness or conceptual strength of the mark; and (2) the commercial strength or

marketplace recognition of the mark. *Fisons Horticulture, Inc.*, 30 F.3d at 479.

In determining the conceptual strength of a mark, courts have devised four categories: (1)

generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *See Two Pesos, Inc. v. Taco*

*Cabana, Inc.*, 505 U.S. 763, 768 (1992).

> Arbitrary or fanciful marks use terms that neither describe nor suggest anything
> about the product; they bear no logical or suggestive relation to the actual
> characteristics of the goods. Suggestive marks require consumer imagination,

> thought, or perception to determine what the product is.   Descriptive terms
> forthwith convey an immediate idea of the ingredients, qualities or characteristics
> of the goods.   Generic marks are those that function as the common descriptive
> name of a product class.

*A&H Sportswear, Inc.*, 237 F.3d at 222 (internal citations and quotations omitted).   Descriptive,

suggestive and arbitrary marks receive trademark protection, while generic marks do not.   *Id.*

(citing *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 297, 305 (3d Cir. 1986)).   This

classification system, however, is not the only measure of conceptual strength of a mark.   *Id.*

Although suggestive and arbitrary marks are generally considered "strong," marks falling within

these categories may still be considered "weak."   *Id.*   This is especially true when the mark is

used in connection with a number of different products, is a term or phrase commonly used by

other companies, or when the term is "self-laudatory."   *Id.* (citations omitted).

> In this case, the mark "ProFoot" is neither conceptually strong nor conceptually weak.

Plaintiff's mark is very similar to the mark analyzed by the United States Court of Appeals for

the Third Circuit in *A&H Sportswear, Inc*.  There, the court held that the mark "Miraclesuit"

was, at best, a suggestive mark.   *Id.* at 223.   The court further reasoned that the use of the term

"miracle" in other markets had a weakening effect on the mark.   In this case, the term "pro"—

often used as shorthand for "professional," as it is here—is a run-of-the-mill word similarly

weakened by its pervasive use by others in commerce.   Similarly, the word "pro" is often used in

a self-laudatory sense.   Therefore, the Court concludes that Plaintiff's mark is conceptually

neutral—i.e., it is neither particularly strong nor particularly weak.

> After reviewing the evidence presented, the Court also believes that the commercial

strength of Plaintiff's mark is, at best, neutral.   This prong of the second *Lapp* factor looks to

factual evidence of marketplace recognition.   *See, e.g.*, *Pa Bus. Bank. v. Biz Bank Corp.*, 330 F.

Supp. 2d 511, 520 (E.D. Pa. 2004) (citing *A&H Sportswear, Inc.*, 237 F.3d at 221).

There are at least four pieces of evidence that support a finding that Plaintiff's mark is commercially strong.  First, ProFoot is the second largest competitor in this market.  Second, ProFoot has spent large sums of money on advertising.  "Although evidence of money spent [on marketing] does not automatically translate into consumer recognition, it is clearly relevant" to the commercial strength of a plaintiff's mark.  *A&H Sportswear, Inc.*, 237 F.3d at 224.  Third, ProFoot has made continuous use of its mark in commerce since 1995, although in different iterations.  Finally, ProFoot offered evidence of a non-exclusive licensing agreement with another company.  *See Pa Bus. Bank. v. Biz Bank Corp.*, 330 F. Supp. 2d 511, 520 (E.D. Pa. 2004) (weighing both the extended length of use of a mark and a licensing agreement with another commercial entity in favor of commercial strength).  Although all of these factors weigh in favor of finding a commercially strong mark, they must be balanced against the evidence tending to show the commercial weakness of Plaintiff's mark.  Defendant's expert, Dr. Alex Simonson, conducted a "fame survey" that tested, among other things, the name recognition of ProFoot.  Dr. Simonson's report concluded that only 6.2% of the 406 qualified respondents knew of the brand name ProFoot.  (Simonson Cert., Ex. A at 8–16).

Balancing all of this evidence together, the Court does not believe that the strength of Plaintiff's mark in this case is particularly probative of the question of whether consumers are likely to be confused by MSD's use of the P.R.O. acronym.

### 5.  Care and Attention Expected of Consumers

The parties next dispute the amount of care consumers use in purchasing orthotic shoe insoles.  After reviewing the evidence, the Court does not find this factor particularly helpful to its overall analysis.  There are two competing concerns that, in the Court's view, weigh equally against each other in analyzing this *Lapp* factor: the inexpensive nature of orthotic shoe insoles and the purpose of this type of shoe insole, which is to relieve or prevent pain.

"Inexpensive goods require consumers to exercise less care in their selection than expensive ones." *Versa Prods. Co.*, 50 F.3d at 204.  In addition to cost, other relevant considerations can include whether "the sales process is as quick as a trip to the check-out counter," whether consultation with a professional is necessary, and whether consumers often buy these products as an "impulse purchase." *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 187 (3d Cir. 2010).  Here, the price of the shoe insoles is roughly between fourteen to sixteen dollars.  (Tr. 121:23–122:4.)  This is affordable for most consumers and no special medical knowledge or access is needed to purchase these products.

At the same time, however, the purpose of orthotic shoe insoles is to relieve or prevent pain.  Many consumers, therefore, are likely to consider this an important purchase.  "The more important the use of the product, the more care that must be exercised in its selection." *Versa Prods. Co. v. Bifold Co. (Mfg.)*, 50 F.3d 189, 205–06 (3d Cir. 1995).  "[H]eightened awareness of health . . . raises the standard of care which the reasonable purchaser of the parties' products would exercise." *McNeil Nutritionals, LLC*, 511 F.3d at 364; *see also Morgenstern Chem. Co. v. G.D. Searle & Co.*, 253 F.2d 390, 393 (3d Cir. 1958) (noting the importance of avoiding mistakes and confusion in the market for medical products); *Kos Pharm., Inc.*, 369 F.3d at 715–17 (discussing same).  Here, Dr. Scholl's Pain Relief Orthotics foot care products are over-the-counter medical devices that are clinically proven to relieve specific medical symptoms in accordance with FDA guidelines.  (Howard Decl. ¶ 14).

Weighing these two considerations against each other, the Court believes that this factor slightly favors ProFoot.  This *Lapp* factor, however, is not particularly probative in this case.

### 6.  Remaining *Lapp* Factors

In analyzing likelihood of confusion, "the court need not apply each and every factor." *A&H Sportswear, Inc.*, 237 F.3d at 214.  This is especially true when products directly compete

against one another.  *Id.*  The Court does not consider the remaining *Lapp* factors at all relevant

to its determination.  The parties do not dispute that MSD's line of Dr. Scholl's Pain Relief

Orthotic shoe insoles directly compete with corresponding ProFoot products.  (Tr. 46:23–25).

Because these products directly compete, it should come as no surprise that they are marketed to

roughly the same (though not identical) target customer base, are marketed through similar

(though not identical) channels,[2] have similar functions, etc.

### 7.   Summary

"[T]he *Lapp* test is a qualitative inquiry."  *A&H Sportswear, Inc.*, 237 F.3d at 215.  This

means that "different factors may properly be accorded different weights," including no weight

at all, "depending on the particular factual setting."  *Id.*  This case must be viewed in light of the

fact that MSD has been selling its Dr. Scholl's Pain Relief Orthotic line of shoe insoles since

2006 and the fact that ProFoot does not have a trademark for the word "pro."  Although ProFoot

has in the past produced other "pro-"products, it is presumed that Plaintiff has since abandoned

any trademark ownership interest that may have existed in these products.  *See* 15 U.S.C. § 1127.

Despite not formally making a "family of marks" argument, it appears to the Court that Plaintiff

is attempting to indirectly do just that.

> To be effective, the "family of marks" argument must rest in the ultimate analysis
> on proof by plaintiff that the designation constituting the "surname" of the family
> is in fact recognized by the public as a trademark in and of itself.  Usually, this
> requires some proof that the "family surname" has been so extensively advertised
> that buyers would be likely to think that defendant's product originates with
> plaintiff.

J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 23:61 (4th ed.

2008).  Despite ProFoot's Executive Vice President's testimony that "for 25 years, [ProFoot has]

---

[2] Although the Court does not consider this factor relevant in this case, it nevertheless notes that this factor likely weighs in favor of MSD.  *See PB Brands, LLC*, 331 F. App'x at 983 (concluding that district court did not abuse its discretion in finding that the parties marketed through different channels when one party marketed through television, radio, newspapers, magazines, trade publications, flyers, brochures, and calendars, while the other party marketed only through flyers in the local community).

been establishing [it]self as . . . the PRO brand," (Tr. 51:4–5), it has not, at least as far as the laws of trademark are concerned.

In this case, the most important *Lapp* factors in the Court's view are the similarity of the mark, the intent of MSD in using the P.R.O. acronym, evidence of actual confusion, and the length of time a mark has been used without confusion.  All four of these factors weigh in favor of denying Plaintiff's motion.  The remaining factors are not particularly probative of likely consumer confusion or are otherwise neutral.  Therefore, MSD's use of the P.R.O. acronym is not likely to cause confusion and Plaintiff is unlikely to succeed on the merits of its direct confusion claim.

### B. Reverse Confusion

In the context of a reverse confusion claim many of the *Lapp* factors are analyzed in the same manner as in a direct confusion claim.  *A&H Sportswear, Inc.*, 237 F.3d at 229.  Some differences may exist, however, because reverse and direct confusion claims seek redress for different types of harm.  As explained above, reverse confusion occurs when a junior user utilizes a senior user's mark and this causes the senior user to somehow become connected to the junior user in the minds of consumers.  *Id.* (citations omitted).  The *Lapp* factors should therefore be tailored toward redressing this situation when analyzed under a reverse confusion claim.  There are two differences between direct and reverse confusion claims recognized by the Third Circuit that are relevant to this case.  The first analytic distinction involves the similarity of the marks and the second concerns the strength of the parties' marks.

The first *Lapp* factor—i.e., the similarity of the marks—is generally "analyzed the same way in direct and reverse confusion claims; the court looks to sight, sound, and meaning, and compares whether these elements combine to create a general commercial impression that is the same for the two marks."  *Id.* (citing *Fisons Horticulture, Inc.*, 30 F.3d at 478–79).  "[A] district

court would not need to examine these in a different manner than it would in a direct confusion claim." *Id.* There is one difference that is recognized in the Third Circuit relevant to this case, however, which concerns the use of house marks. Although the use of a house mark usually lessens the risk of consumer confusion, "there is also the possibility that the mark will aggravate, rather than mitigate, reverse confusion, by reinforcing the association of the word ['pro'] exclusively with [MSD and Dr. Scholl's]." *Id.* at 230 (citing *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 960 (7th Cir. 1992); *Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1288 (9th Cir. 1992)). But, this does not necessarily occur in every case. *See id.* ("Of course, we do not mean to suggest that this actually occurred in this particular case . . . ."). No evidence was presented in this case that consumers now link the word "pro" with Dr. Scholl's and MSD other than Dr. Scholl's new marketing campaign urging consumers to "go pro." *See, e.g.*, (Tr. 57:17–58:6). Absent evidence that this marketing has actually had the effect of reinforcing the association of "pro" exclusively with Dr. Scholl's, the Court does not consider this marketing campaign on its own accord to be very probative in this case. *See A&H Sportswear, Inc.*, 237 F.3d at 224 ("[E]vidence of money spent [on marketing] does not automatically translate into consumer recognition . . . ."). Therefore, for the reasons discussed above, *see supra* Part II.A.1, the Court believes that the first *Lapp* factor weighs in favor of MSD on Plaintiff's reverse confusion claim.

The next difference between direct and reverse confusion claims relevant to this case concerns the strength of the marks at issue. Unlike a direct confusion claim, which focuses almost exclusively on the strength of the plaintiff's mark, in a reverse confusion claim the focus of a district court's analysis should be on the strength of the junior user's mark. *See A&H Sportswear, Inc.*, 237 F.3d at 230–31. "[I]n a reverse confusion claim, a plaintiff with a commercially weak mark is more likely to prevail than a plaintiff with a stronger mark, and this

19

is particularly true when the plaintiff's weaker mark is pitted against a defendant with a far stronger mark." *Id.* at 231.  This is because "it is the strength of the larger, junior user's mark which results in reverse confusion." *Commerce Nat'l Ins. Servs., Inc.*, 214 F.3d at 444.  As discussed above, in the direct confusion context this *Lapp* factor was neutral and not very probative.  In the reverse confusion context, however, this factor undoubtedly favors ProFoot.  The Dr. Scholl's mark is conceptually strong because this name is arbitrary and fanciful and it is, by Defendant's own measure, commercially strong as well.  *See* (Tr. 118:24 ("[A]lmost everyone [has] heard of it . . . ."); 119:13–14 ("In general, we spend an enormous amount of money on advertising and consumer promotions, in the tens of millions of dollars year after year.")); *see also A&H Sportswear, Inc.*, 237 F.3d at 231 ("[I]n a reverse confusion claim, a court should analyze the 'commercial strength' factor in terms of (1) the commercial strength of the junior user as compared to the senior user; and (2) any advertising or marketing campaign by the junior user that has resulted in a saturation in the public awareness of the junior user's mark." (citing *Fisons Horticulture, Inc.*, 30 F.3d at 474, 479)).

With the exception of these two differences, the analysis in the reverse confusion context for determining whether there is a likelihood of confusion is the same as that used for Plaintiff's direct confusion claim discussed above.  In the reverse confusion context at least one of the *Lapp* factors favors ProFoot, but the Court does not believe that this alone warrants the conclusion that Plaintiff is likely to succeed in proving the merits of this claim.  The dissimilarity of the marks, the lack of a deliberate intent to confuse by MSD in adopting the P.R.O. acronym, and the lack of evidence of actual confusion (even after eight months have passed since MSD started using the P.R.O. acronym) all still weigh in favor of MSD in the reverse confusion context.  The Court, therefore, does not believe that Plaintiff is likely to succeed on the merits in proving its reverse confusion claim.

### C.  *Unfair Competition*

Plaintiff also seeks a preliminary injunction based upon his state-law claims for unfair competition.  "There is no distinct cause of action for unfair competition.  It is a general rubric which subsumes various other causes of action."  *C.R. Bard, Inc. v. Wordtronics Corp.*, 561 A.2d 694, 696 (N.J. Super. Ct. 1989).  In order to succeed on this claim, Plaintiff still will have to prove a likelihood of confusion.  *See, e.g.*, *SK&F, Co. v. Premo Pharm. Labs., Inc.*, 625 F.2d 1055, 1066 (3d Cir. 1980) ("[E]xcept for the interstate commerce requirement, the elements of the unfair competition torts proscribed by New Jersey law and by section 43(a) of the Lanham Act are the same . . . .").  Therefore, the same analysis above also applies with full force to Plaintiff's unfair competition claims.

## IV.   IRREPARABLE HARM

The next prong of a preliminary injunction analysis is whether the plaintiff will suffer irreparable harm as a result of the defendant's actions if an injunction is denied.  *See Kos Pharm., Inc.*, 369 F.3d at 708 (citing *Allegheny Energy, Inc.*, 171 F.3d at 158).  The Court has determined that ProFoot has not satisfied this prong.

In attempting to establish irreparable harm ProFoot argues that "[o]nce the likelihood of confusion caused by trademark infringement has been established," irreparable harm is also established as a matter of law.  *Kos Pharm., Inc.*, 369 F.3d at 726 (citing *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir. 1998)).  By contrast, MSD argues that—even assuming Plaintiff has established the likelihood of confusion—the Third Circuit precedent establishing a presumption of irreparable harm has since been superseded by the Supreme Court of the United State's decision in *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006).  MSD then argues that Plaintiff has not submitted evidence of actual irreparable harm, and because

ProFoot can no longer rely on a presumption to establish this prong, an injunction should be denied.

In *MercExchange*, the Court held that the traditional four-factor test for issuing a preliminary injunction should apply to patent cases and that granting an injunction based upon a categorical rule should be avoided. *Id.* at 393–94. Some federal courts throughout this country have expanded this reasoning into the context of trademark infringement. *See, e.g.*, *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 342–43 (S.D.N.Y. 2010). And although courts in this circuit have continued to adhere to the old rule permitting a presumption of irreparable injury once likelihood of confusion is established,[3] it also appears that no court in this circuit has specifically addressed the issue now presented. *See Schering-Plough Healthcare Prods., Inc. v. Neutrogena Corp.*, No. 09-642, 2011 U.S. Dist. LEXIS 61165, at *5 (D. Del. June 8, 2011) (citations omitted) (noting that "[t]here is no clear indication that this presumption still applies in the wake of [*MercExchange*]" and explicitly avoiding answering this question). Because the Court has already determined that Plaintiff is unlikely to succeed on the merits, this unsettled question of law need not be answered by the Court.

There is another reason that the Court believes that Plaintiff will not suffer irreparable harm. ProFoot became aware of MSD's intent to use the P.R.O. acronym in its product branding at some time in the summer of 2011. *See* (Tr. 47:18–48:7). It is not clear to the Court that ProFoot should have acted at this point to stop MSD's use of the P.R.O. acronym because there

---

[3] *See Coach, Inc. v. Fashion Paradise, LLC*, No. 10-4888, 2012 U.S. Dist. LEXIS 7429, at *25 (D.N.J. Jan. 20, 2012) (citation omitted) (adhering to old rule without discussion); *Mt. Nittany Med. Ctr. v. Nittany Urgent Care, P.C.*, No. 11-622, 2011 U.S. Dist. LEXIS 134585, at *8 (M.D. Pa. Nov. 22, 2011) (citations omitted) (same); *Sabinsa Corp. v. Creative Compounds, LLC*, No. 04-4239, 2011 U.S. Dist. LEXIS 82001, at *18–20 (D.N.J. July 27, 2011) (same); *World Entm't, Inc. v. Brown*, No. 09-5365, 2011 U.S. Dist. LEXIS 55182, at *18–21 (E.D. Pa. May 20, 2011) (briefly discussing issue but without reference to *MercExchange*); *Alliance Bank v. New Century Bank*, 742 F. Supp. 2d 532, 565–66 (E.D. Pa. 2010) (applying old rule but also citing to MercExchange while noting that equitable considerations in the case also warranted the issuance of a preliminary injunction). *But see Louis Vuitton Malletier, S.A. v. Mosseri*, No. 07-2620, 2009 U.S. Dist. LEXIS 100851, at *14–17 (D.N.J. Oct. 28, 2009) (citing *MercExchange* and relying on equitable considerations rather than a presumption in issuing an injunction).

is testimony indicating that the NACS marketplace (where Plaintiff first became aware of MSD's possible use of the P.R.O. designation) is a sounding board for *possible* ideas that companies may or may not bring to market.  (*Id.* 48:21–49:17).  By early September 2011 at the latest, however, ProFoot knew that MSD had started using the P.R.O. acronym in the market.  (*Id.* 49:18–24).  Plaintiff did not file the present suit until December 5, 2011.  (Compl.) [1].  Plaintiff also did not send MSD a cease-and-desist letter prior to filing its Complaint in this case.  (Tr. 65:23–66:3).

"Where a Plaintiff delays in seeking preliminary injunctive relief, such delay is evidence that speedy relief is not needed."  *EMSL Analytical, Inc. v. Testamerica Analytical Testing Corp.*, No. 05-5259, 2006 U.S. Dist. LEXIS, at *38–39 (D.N.J. Apr. 4, 2006) (collecting cases).  An unjustified delay—in this case at least three months—"knocks the bottom out of any claim of immediate and irreparable harm."  *Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F. Supp. 2d 335, 383–84 (D.N.J. 2002) (collecting cases).[4]  Because of this unjustified delay and because Plaintiff has not otherwise shown a likelihood of success on the merits, ProFoot has not established that it is being irreparably harmed by MSD's use of the P.R.O. acronym.

## V.    GREATER HARM TO MSD

The third prong of a preliminary injunction analysis asks whether greater harm will inure to the defendant if an injunction is granted as compared to the harm suffered by the Plaintiff if an injunction is not granted.  *See Kos Pharm., Inc.*, 369 F.3d at 708 (citing *Allegheny Energy, Inc.*, 171 F.3d at 158).  ProFoot argues that any harm suffered by MSD is self-inflicted because MSD

---

[4] Moreover, when Plaintiff filed its Complaint, it was not accompanied with a motion for a preliminary injunction. Rather, Plaintiff concurrently filed with its Complaint a motion for expedited discovery in aid of a future motion for a preliminary injunction. [1-2].  Although this may be entirely appropriate in many cases, in the context of this case—a trademark infringement case between directly competing goods—it seems odd in light of the Third Circuit's statement that a court "need rarely look beyond the mark itself" in determining whether a likelihood of confusion exists.  *Lapp*, 721 F.2d at 462.  Although the Court is aware that this statement "may be an exercise in unjustified optimism," *A&H Sportswear, Inc.*, 237 F.3d at 212, the need for expedited discovery nevertheless undercuts Plaintiff's argument that the similarity between the use of the P.R.O. acronym and ProFoot's mark is self-evident.

failed to do the appropriate due-diligence to determine whether its use of the P.R.O. acronym would likely cause consumer confusion.  Therefore, ProFoot posits, MSD should not be able to argue that it would suffer harm as a result of an injunction.  This argument relies on the assumption that ProFoot has established a likelihood of consumer confusion, but as discussed above, ProFoot has not made this showing.  For this reason, Plaintiff's argument must be rejected by the Court.

In addition, Defendant has submitted evidence that it will suffer a significant monetary harm if an injunction was issued.  Plaintiff seeks an order from the Court mandating, among other things, that MSD cover up the use of the P.R.O. acronym on its packaging by placing a sticker over it.  This would undoubtedly cost a considerable amount of money.  *See generally* (Tr. 138:14–139:22 (explaining process of placing stickers on products)).  Although the Court is not convinced that this harm is necessarily significant in the larger context of this case, it is harm nevertheless.  Therefore, Plaintiff has failed to satisfy the third prong of a preliminary injunction analysis.

## VI.  PUBLIC INTEREST

The final prong of a preliminary injunction analysis asks whether the public interest favors the issuance of an injunction.  *See Kos Pharm., Inc.*, 369 F.3d at 708 (citing *Allegheny Energy, Inc.*, 171 F.3d at 158).  ProFoot argues that the public interest at stake in this case is synonymous with the right of the public not to be deceived or confused.  *See Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187 (3d Cir. 1990).  Again, however, this argument relies on the assumption that Plaintiff has proven a likelihood of consumer confusion.  As explained above, Plaintiff has not made such a showing.  Therefore, ProFoot's argument must be rejected.  Thus, Plaintiff has failed to satisfy this fourth prong of a preliminary injunction analysis as well.

24

## VII.   CONCLUSION

For the reasons stated above, it is on this 14th day of June, 2012,

ORDERED that Plaintiff's Motion for a Preliminary Injunction [42] is DENIED.




                                            */s/ Anne E. Thompson*
                                            ANNE E. THOMPSON, U.S.D.J.